EILEEN M. DECKER
United States Attorney
PATRICIA A. DONAHUE
Chief National Security Division
B. CELESTE CORLETT (Cal. Bar No. pending)
Arizona State Bar No. 021724
Assistant United States Attorney
      8000 United States Courthouse
      411 West Fourth Street
      Santa Ana, California 92701
      Telephone:  (714) 338-3541
      Facsimile:  (714) 338-3708
      E-mail:    Celeste.Corlett@usdoj.gov
ANNAMARTINE SALICK (Cal. Bar No. 309254)
Assistant United States Attorney
      312 North Spring Street
      Los Angeles, California 90012
      Telephone:  (213) 894-3424
      Facsimile:  (213) 894-6436
      E-mail:    Annamartine.Salick2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>ADAM DANDACH,<br>Aka, Fadi Fadi Dandach,<br><br>　　　　　Defendant. | No. SA CR 14-109-JVS<br><br>GOVERNMENT'S RESPONSE TO PRESENTENCE INVESTIGATION REPORT AND POSITION WITH RESPECT TO SENTENCING<br><br>Sentencing Date:  July 25, 2016<br>Sentencing Time:  9:00 a.m.<br>Before Honorable James V. Selna |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and undersigned counsel, hereby files the Government's Response to the Pre-Sentence Investigation Report (CR 80) and Position with Respect to Sentencing of Defendant Adam Dandach.

1      This response to the Presentence Investigation Report and

2   sentencing position are based on the attached Memorandum of Points

3   and Authorities, the Presentence Investigation Report, the records

4   and files of this case, the expert reports of Evan Kohlmann and Dr.

5   Saul Faerstein, the evidence presented at the Evidentiary Sentencing

6   Hearings, and any further evidence or argument the Court may allow.

7   Dated:   July 1, 2016          Respectfully submitted,

8                                  EILEEN M. DECKER
                                   United States Attorney
9
10                                 /s/
                                   _____
11                                 CELESTE CORLETT
                                   ANNAMARTINE SALICK
12                                 Assistant United States Attorneys

13                                 Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES..................................................iii

SENTENCING MEMORANDUM...................................................1

I.    INTRODUCTION......................................................1

II.   FACTUAL BACKGROUND...............................................1

      A.    Defendant's Background.....................................1

      B.    Defendant's Supports Violent Jihad.........................2

      C.    Defendant's First Attempt to Travel to
            Syria to Join ISIL.........................................6

      D.    Defendant's Second Attempt to Travel to
            Syria to Join ISIL.........................................6

      E.    Defendant's Post-Arrest Obstruction and
            Continued Support of Violence..............................8

III.  PROCEDURAL HISTORY..............................................10

IV.   GOVERNMENT'S SENTENCING POSITION AND
      RECOMMENDATION..................................................12

      A.    Sentencing Guidelines Calculation.........................12

            1.    Acceptance of Responsibility
                  (§ 3E1.1)...........................................13

            2.    Application of the Terrorism
                  Adjustment (§ 3A1.4(a))............................13

            3.    Defendant's Age (§ 5H1.1).........................15

            4.    Defendant's Mental Condition
                  (§ 5H1.3)...........................................15

            5.    Defendant's Purported Physical
                  Condition (§ 5H1.4)...............................19

      B.    Nature and Circumstances of the Offenses..............20

      C.    History and Characteristics of the
            Defendant.................................................21

      D.    Seriousness of the Offense, Respect for
            The Law, Adequate Deterrence, and Just
            Punishment................................................22

i

TABLE OF CONTENTS - (continued)

PAGE

    E.   Protection of the Public and Need to
        Provide Defendant with Training or
        Correctional Treatment............................23

    F.   Kinds of Sentences Available and
        Policy Considerations.............................23

    G.   Need to Avoid Sentencing Disparities...............24

V.     CONCLUSION.............................................25

## TABLE OF AUTHORITIES

PAGE

FEDERAL CASES

United States v. Awan,
    607 F.3d 206 (2nd Cir. 2010)................................14

United States v. Becerril-Lopez,
    541 F.3d 881 (9th Cir. 2008)...............................24

United States v. Doering,
    909 F.2d 392 (9th Cir. 1990)..........................passim

United States v. Howard,
    894 F.2d 1085 (9th Cir. 1990)..............................15

United States v. Saeteurn,
    504 F.3d 1175 (9th Cir. 2007)..............................24

United States v. Wilson
    900 F.2d 1350 (9th Cir. 1990)..............................15

FEDERAL STATUTES

18 U.S.C. § 1512 (c)(1).......................................10

18 U.S.C. § 1542...................................10, 11, 13

18 U.S.C. § 1542(c)(1)........................................12

18 U.S.C. § 2339B.........................................passim

18 U.S.C. § 2339b(g)(5).......................................13

18 U.S.C. § 3553(a)(2)........................................12

18 U.S.C. 3553(a)(2)(C).......................................23

iii

SENTENCING MEMORANDUM

## I.   INTRODUCTION

Adam Dandach ("defendant") attempted to provide material support, himself, to a foreign terrorist organization, that is, the Islamic State of the Iraq and the Levant ("ISIL"), and in order to obtain a duplicate passport to travel to join ISIL, Defendant made a false statement in his passport application.  For these offenses, a sentence of 240 months' imprisonment and a lifetime term of supervised release is a just and fair punishment for one count each of violating 18 U.S.C. §§ 2339B and 1542.

The government agrees with the Probation Officer's summary of the offense conduct and the Guidelines calculation, but it does not agree with the recommended departures or the recommended sentence of 180 months' imprisonment.

## II.   FACTUAL BACKGROUND

### A.   Defendant's Background

Defendant is twenty-two years old.  (PSR, p. 2.)  He is a United States citizen who is a native of Orange County, California, and prior to his arrest in this matter lived in Orange, California with his mother and juvenile sister.  (PSR, p. 2, ¶ 59, 61, 62.) His father was ordered deported from the United States on July 7, 2008 based on a domestic violence conviction and a petty theft. (Attachment 1.)  Defendant has an older sister and brother from his mother's previous marriage who also live in Orange County.  (PSR ¶ 62.)  In 2012, defendant graduated from high school and then successfully attended a community college, both in Orange, California.  (PSR ¶ 78.)

Beginning in 2013, defendant underwent a dramatic physical transformation.  In March 2013, defendant had gastric bypass surgery.  (PSR ¶ 70.)  At the time of the surgery, he weighed approximately 500 pounds.  (Id.)  From February 2013 until his arrest in July 2014, the defendant lost approximately 250 pounds. (PSR ¶ 68.)

**B.   Defendant's Supports Violent Jihad**

In May 2013, defendant was attending college and living at home with his mother.  (PSR ¶ 67.)  By this time, he was already deep into consuming and promoting terrorists' lectures, videos, and graphic pictures of violent terrorist acts. (*See* Expert Report of Evan Kohlmann ("Kohlmann")).  Through his different social media cites including Facebook, Youtube, and an online chat forum, defendant posted terrorists' lectures and pictures, discussed the radical ideas of the terrorists he followed, and encouraged other people to do the same.  (Testimony of Special Agent Scott Wales, April 21, 2016, Reporter's Transcript ("04/21/2016 RT"), pp. 12-14; Kohlmann, pp. 5, 14, 16, 19-30.)

Defendant listened to Anwar al-Awlaki, a specially designated global terrorist and a prominent figure among individuals who seek to join foreign terrorist organizations.[1]  (Kohlmann, p. 11-12.) Defendant publicly posted on his social media page at least seven of al-Awlaki's lectures, which included "44 Ways to Support Jihad" wherein Awlaki stated that would-be Muslim fighters must support their land and religion, even if they were children whose parents

---

[1]   In 2010, the United States Treasury Department listed Anwar al-Awlaki as a specially designated global terrorist.  See also Kohlmann, p. 9-12.

2

refuse to do so. (Id. at 11.)  Defendant expressed support for Osama

bin Ladin, members of the Al-Muhajiroun (a terrorist group in the

United Kingdom ("UK")), and Shaykh Faisal (convicted of soliciting

murder in the UK).  (Id. at 8, 16, 17, 19-20, 22.) On September 5,

2013, defendant posted in a chatroom a video copy of a *nasheed* which

praised Usama Bin Ladin:

> [The] leader bin Laden terrorizes America.  Our
> strength is in our iman and our weapon is the PK.  If
> they call me a terrorist, I say that this is an honor.
> A blessed form of terrorist; A divine da'wah.  We
> destroyed America with a civilian airplane.

(Kohlmann, pp. 8, 9.)

Defendant also read material that supported terrorism and he

encouraged his social media friends to do the same.  He explained to

social media friends that he had read the Black Flags of Syria,

*Inspire* magazine, and a Taliban website to keep updated on the

*mujahideen*, meaning those who practice jihad as "holy warriors."

(Kohlmann, pp. 28, 42, 61.)  The Black Flags is a series of

documents published by ISIL that describe the background of ISIL and

provided guides to guerilla warfare and other violent tactics.  (Id.

at 42.)  *Inspire* magazine claims it "is geared towards making the

Muslim a mujahid in Allah's path."  (Id.)  It includes instructional

material on guerilla war tactics, bomb making techniques, weapons

training, and other information on self-radicalization.  (Id., p.

26.)

Defendant read materials on acheiving martyrdom through jihadi

fighting, including The Revivers of the Khalifah.  (04/21/2016, RT,

pp. 50-56.)  This book included directions on how to reach Syria;

examples of English-speaking persons who were fighters in Syria; and

"Muslims who left the West," were in Syria, and could be contacted to answer further questions through Twitter accounts.  (Id., p. 56; Ex. 12, pp. 101, 104.)  All of these Twitter accounts were on defendant's phone.  (04/21/2016 RT, p. 56.)

Defendant continued his support for terrorism throughout 2013 and began expressing his desire to join ISIL.  In June, while discussing the fighting in Syria, defendant told his friend that the Khilafah was coming soon, and he wished to fight one day.  (04/21/2016 RT, p. 59; Ex. 11.)  In July 2013, defendant claimed to follow updates of "mujahideen" who were fighting in Syria, and he shared the website link with his friend, so his friend could also get updates of the fighting in Syria.  (Kohlmann, p. 58.)  Defendant downloaded hundreds of Tweets from terrorist supporters including ISIL's daily battle updates on the "successes" of ISIL in Syria, pictures of military fighters in Syria, executions, and decapitated heads.  (04/21/2016 RT, p. 33-37.)  In August 2013, defendant described a "brother" who was martyred during Ramadan and then stated that he wished he (defendant) could be in his (the martyr's) position.  (Kohlmann, p. 58.)

Defendant also communicated personally with at least two people in Syria.  Defendant admitted to FBI Special Agents that one of his social media friends, Abu Turab al-Canadi, was fighting in Syria for ISIL.  (Kohlmann, pp. 48-49.)  The FBI also located on his phone communications with this person.  (Id.)  It was through this friend that defendant learned that ISIL would provide him basic weapons training; in addition defendant admitted to watching ISIL training videos.  (Kohlmann, pp. 30, 36, 49.)  Another friend in Syria, who defendant called "Mohammed Z," claimed to be in Syria to help the

4

widows and orphans.  (Kohlmann, pp. 46-48.)  A review of Mohammed

Z's website revealed discussions of support for ISIL and encouraging

others to join ISIL, nearly exclusively.  (04/21/2016 RT, pp. 46-

47.)

    Defendant admitted to having recordings of multiple *nasheeds*

and encouraged others to listen to them.  (Kohlmann, pp. 7-9.)

(*Nasheeds* are Islamic songs, often sung in Arabic; foreign terrorist

organizations commonly share *nasheeds* that praise battle victories

and martyrs).  These particular *nasheeds* were focused on violent

jihadi themes.  (<u>Id.</u>, p. 7.)  "[S]elect nasheed songs have become

virtually synonymous with jihadi military operations, and in

particular, videos of suicide bombings."  (<u>Id.</u>)  A few months before

defendant requested his expedited passport in his attempt to travel

to Syria a second time, he pasted in a document the lyrics of a

jihadi *nasheed* that stated:

> I am a terrorist. . . .  By the sword, by the fire, we
> repel the plot of the evildoers . . . They killed and
> committed treachery and oppression and explosions.  So
> today, woe, woe, woe to the aggressors, woe to the
> aggressors.  I am a terrorist. . . . One day in
> hatred, they killed an old man at home. And today, in
> reply, a young man takes his revenge.

(Kohlmann, p. 7.)  Defendant posted another *nasheed* on an online

chat room he visited, and he shared the same jihadi *nasheed* on

Facebook and told he friend that he should listen to it.  Some of

the lyrics include the following:

///

///

5

> In the path of Allah, we have walked, And announced
> Jihad . . . .   We have returned with a machine gun . .
> . And we have followed the awakening of this
> generation, Groups and Individuals . .   We have come
> to you with an elucidating Qur'an and a machine gun
> (rata-tat-tat-tat-tat).

(Id.)

### C.   Defendant's First Attempt to Travel to Syria to Join ISIL

On the November 22, 2013, defendant applied for an expedited United States passport.  (Plea Agrt., p. 9.)  On December 6, 2013, located on Defendant's computer was a four page document that "appeared to offer advice on the steps necessary 'to give the Bay'ah (oath) of allegiance to an Ameer starting from the land of ash-Sham [Syria]," a document the FBI later found after defendant's July 3rd arrest. (Kohlmann, p. 55.)  Defendant's expedited passport was issued in early December 2013.  (Plea Agrt., p. 9.)  Shortly thereafter, defendant booked a one-way flight with an arrival on December 26, 2013 in Istanbul, Turkey.  (Id.)  Before he departed, a family member learned of his plans to travel to Turkey, and fearing for his safety, took his passport and cash, so he could not travel. (Id.)

### D.   Defendant's Second Attempt to Travel to Syria to Join ISIL

Defendant continued to make plans to carry out his intention to provide material support and resources to ISIL after his family intervened in his first attempt to travel.  Defendant corresponded and planned with others who were in Syria, including at least one person who was in Syria fighting for ISIL, so he could travel to Syria to work under the direction and control of ISIL. (Id.) Defendant obtained information and guidance to achieve this purpose,

including by acquiring booklets on how to travel to Syria, flights to the area, and maps of ISIL-controlled areas. (Id.) Defendant applied for an expedited 2014 passport and falsely stated on his application that he had lost his 2013 passport when he accidently threw it in the trash in June 2013. (Id.) Defendant knew at the time that he made the statement it was false because he knew that his mother had taken his passport in December 2013, and that he had not lost it. (Id.)

On July 1, 2014, defendant received his duplicate expedited passport. (Id.) On the very same day, he booked a flight that departed John Wayne Airport in Santa Ana, California, the very next day, July 2, 2014, with a final destination of Istanbul, Turkey. (Id.) On July 2, 2014, defendant went to John Wayne Airport and taking with him luggage, a laptop computer, and a Smartphone. (Id. at 10.) Located in the Smartphone, he had downloaded *nasheeds* supporting ISIL fighting, maps of ISIL controlled areas, Twitter updates on ISIL fighting in Syria and Iraq, and a pamphlet on how to reach a Syrian border city from Istanbul (guidance that he last accessed earlier that day). (Id. at 10.) Aslo on that day, defendant emailed his friend to say that he did not know why people did not step forward and help the situation, and complained "how people expect a khilafah to arise without bloodshed" and claimed that "it's a golden opportunity." (Id. at 10.)

On July 2, 2014, during an interview at the airport, defendant told FBI Special Agents that ISIL had declared a caliphate on June 29, 2014, and that it was mandatory for every able Muslim to migrate to the land of Islam. (Id. at 10.) He stated that if someone wants to invade "our land, we have to fight back." (Id. at 10.) He

described the invaded lands as Afghanistan, Iraq, and the Syrian regime. (<u>Id.</u> at 10.)  Defendant admitted to the agents that he intended on that date to fly to Istanbul, Turkey, and his ultimate destination was ISIL-controlled Syria. (<u>Id.</u> at 10.)  He intended to pledge allegiance to the leader of ISIL, Abu Bakr Al-Baghdadi. (<u>Id.</u> at 10.)  And, he intended to live under the control of ISIL. (<u>Id.</u> at 10.)  Defendant admitted that he intended to take weapons training from ISIL to defend himself. (<u>Id.</u> at 10.)

### E.   Defendant's Post-Arrest Obstruction and Continued Support of Violence

After defendant was arrested and detained, he quickly began to seek his family's help to eliminate internet postings he had made prior to his arrest.  Defendant was a regular contributor to an internet chat room, Ummah.com. (<u>See</u> Kohlmann, p. 55-59.)  He admitted that it was through this forum that he communicated with an ISIL fighter and learned about ISIL training. (04/21/2016, pp. 42-44.)  After he was detained, defendant immediately began asking his family to delete postings he had made on the website to his very close friends.  (PSR ¶ 31.)  Defendant eventually convinced a family member to go into his online account and delete all his posting history.  (<u>Id.</u>)  The material was deleted and could not be recovered by the FBI.  Although it is not known what material defendant had deleted, it is known that he often posted the jihadi videos in this chatroom and learned from persons fighting in Syria what type of training to expect. (04/21/2016 RT, pp. 42-44.)

While detained, pending the outcome of this case, defendant composed several writings.  These writings discussed themes of violence and support of domestic and international terrorism.  One

item, entitled "The Price of Freedom of Speech," dated January 10, 2015, was sent by defendant to a reporter at the Orange County Register where it was published. (Attachment 2.)  The writing concerned the January 7, 2015 terrorist murders of journalists in Paris.  (Id.)  In his writing, Defendant expressed support for the terrorists and condemned the journalists.  (Id.)  In his cover letter to the newspaper, Defendant wrote, "[t]his poem does not necessarily reflect my personal opinion of the recent situation in France.  I do not at all feel any sympathy for the dead cartoonists and I do not condemn the brothers for their defense of the Prophet's name. . . . If I have offended anyone, that was my intention." (Id.)  In his writing, he stated to the victims, "rot in a grave of fire, right were you belong." (Id.)  Then, defendant concluded by stating, "Je Su[is] Al Qaeda.  Leaving another scar." (Id.)

In May 2015, defendant read to his brother a "rap" he authored. (Attachment 3.)  Defendant read his brother a disturbing story about a "rejected young boy, bullied since elementary" with an abusive stepfather.  (Id.)  In this story, defendant described how the boy decided to "show the world he's not afraid, and punish everyone." (Id.)  He then described the boy shooting his parents, teachers, and students with an AK-47 and being killed via "suicide by Cop," but claimed it made him feel "like a God." (Id.)  Defendant ended the rap with "think hard of the punishment that God will inflict upon you . . . ." (Id.)  This occurred just a few days after his brother had told Defendant that his writings were alarming to the Santa Ana Jail staff.  (Attachment 4.)  He told defendant to be careful about what he writes and told him to rip it up into pieces and make it hard for them to piece together.  (Id.)

1   Although detained defendants are not allowed to search the
2   Internet while at the Santa Ana Jail, defendant repeatedly had his
3   family members search the web for books on ISIL, news articles on
4   the San Bernardino terrorist shootings, updates from ISIL, and known
5   terrorists such as Anjem Choudary (see Kohlmann, p. 14).
6   (Attachment 5.)

7   **III. PROCEDURAL HISTORY**

8   On March 4, 2015, a Grand Jury charged defendant, also known as
9   Fadi Fadi Dandach, in a First Superseding Indictment with Attempting
10  to Provide Material Support and Resources to a Designated Foreign
11  Terrorist Organization, ISIL, in violation of 18 U.S.C. § 2339B;
12  Making a False Statement on a Passport Application and Use of a
13  Passport Obtained through a False Statement to Facilitate
14  International Terrorism, in violation of 18 U.S.C. § 1542; and,
15  attempting to Destroy Records in an Official Proceeding, in
16  violation of 18 U.S.C. § 1512 (c)(1).  (CR 28.)

17  On August 10, 2015, defendant pled guilty pursuant to a plea
18  agreement to an Information charging him with Attempting to Provide
19  Material Support and Resources to a Designated Foreign Terrorist
20  Organization, ISIL, in violation of 18 U.S.C. § 2339B and False
21  Statement in a Passport Application, in violation of 18 U.S.C.
22  § 1542.  (CR 69, 71.)

23  At the time defendant committed the § 2339B offense, the
24  statutory maximum term of imprisonment was 15 years.  The statutory
25  maximum sentence for a violation of § 1542 is 10 years.  Thus, the
26  total statutory maximum is 25 years' imprisonment.

27
28

On April 21 and June 2, 2016, the Court heard testimony and saw evidence at the sentencing evidentiary hearings concerning the defendant's dangerousness and mental health.  (CR 107.)

Prior to the hearings, on October 14, 2015, the United States Probation Office ("USPO") prepared a Presentence Investigation Report ("PSR") calculating defendant's total offense level as 37 and defendant's criminal history category as VI, for an advisory guideline range of 360 months to life imprisonment.  (PSR ¶ 86.) However based on the statutory maximums, the guideline range was adjusted to 300 months.  (Id. 87.)  The Probation Office recommended a sentence of 180 months imprisonment based on departures for defendant's age, mental health, and physical condition pursuant to the United States Sentencing Guidelines ("USSG") Sections 5H1.1, 1.3, and 1.4. (United States Probation Office Sentencing Letter ("Sentencing Letter"), p. 6.)

The government respectfully but strongly disagrees with the PSR's departures and recommended sentence.  As described below, the government contends that, in the context of a defendant who sought to join the world's most dangerous terrorist organization, defendant's age, which, sadly, is consistent with that of others committing federal terrorism crimes, is an entirely inappropriate basis on which to recommend a reduced sentence.  Moreover, defendant's characteristics, including his health, are already accounted for in the plea agreement and do not warrant leniency in the form of a further reduction from the dramatically higher 300-month range reflected in the Guidelines.

The Court ordered the parties to file their Sentencing Memorandum and Objections by July 1, 2016, and, on July 15, 2016,

file their responses to the other party's Sentencing Memorandum and Objections.  (CR 124.)  The Sentencing Hearing is set for July 25, 2016 at 9:00 a.m.

Defendant is in custody.

## IV. GOVERNMENT'S SENTENCING POSITION AND RECOMMENDATION

The recommended sentence of 240 months' imprisonment and a lifetime term of supervised release, and a $100 mandatory special assessment, is sufficient, but not greater than necessary, to address the factors set forth in 18 U.S.C. § 3553(a)(2).  The factors set forth in § 3553(a) are addressed below.

### A. Sentencing Guidelines Calculation

Pursuant to the Plea Agreement, the parties agreed to the following sentencing factors (Plea Agrt ¶ 14):

1.  Violation of 18 U.S.C. § 2339B

| Base Offense Level: | +26 | [U.S.S.G. § 2M5.3] |
| Specific Offense Characteristic : | +2 | [U.S.S.G. § 2M5.3(b)(1)(E) |
| Terrorism Adjustment | +12 | [U.S.S.G. § § 3A1.4(a)] |

2.  Violation of 18 U.S.C. § 1542(c)(1)

| Base Offense Level: | +8 | [U.S.S.G. § 2L2.2(a)] |
| Specific Offense Characteristic : | +4 | [U.S.S.G. § 2L2.2(b)(3)] |
| Terrorism Adjustment | +12 | [U.S.S.G. § § 3A1.4(a)] |

Pursuant to the application of USSG § 3A1.4(b), defendant's criminal history category under the Sentencing Guidelines is Category VI.

Defendant's advisory guideline range, based on a total offense level of 37 and a criminal history category of VI, is 360 months to

life imprisonment.  (PSR ¶ 86.)  However because the combined
statutory maximum is 25 years, the guideline range was adjusted to
300 months.  (PSR ¶ 86.)  The government contends that a sentence of
240 months (20 years) imprisonment with lifetime supervised release
is the appropriate sentence here.

### 1.   Acceptance of Responsibility (§ 3E1.1)

At the time of sentencing, if defendant continues to
demonstrate an acceptance of responsibility for the offense up to
and including the time of sentencing, the government will recommend
a reduction totaling three-levels pursuant to U.S.S.G. § 3E1.1.
(Plea Agrt. ¶ 3.d).

### 2.   Application of the Terrorism Adjustment (§ 3A1.4(a))

In Count One, the parties agreed that a twelve-level Terrorism
Adjustment is warranted because the offense of Attempting to Provide
Material Support "involved, or was intended to promote, a federal
crime of terrorism."  (U.S.S.G. § 3A1.4(a); Plea Agrt. ¶ 14.a.)  A
"federal crime of terrorism" has the meaning given under 18 U.S.C.
§ 2339b(g)(5), which includes 18 U.S.C. § 2339B, the offense charged
in Count One.  Likewise, the PSR agreed the adjustment applied to
Count One.  (PSR ¶ 29.)

In Count Two, the parties agreed that the same twelve-level
Terrorism Adjustment was warranted.  (Plea Agrt. ¶ 41.b.)  The PSR
did not recommend applying this adjustment because 18 U.S.C. § 1542,
the felony at issue here, "is not among the list of enumerated
offenses."  (PSR ¶ 35.)  That reasoning is misplaced.  The
adjustment applies to defendant's § 1542 felony because this felony
was "intended to promote" a federal crime of terrorism, namely, the

13

crime of providing material support to a foreign terrorist organization, § 2339B.

The Second Circuit held that under the "intended to promote" prong of § 3A1.4(a), "so long as the defendant's offense was intended to encourage, further, or bring about a federal crime of terrorism as statutorily defined, the defendant himself does not [even] have to commit an offense listed in § 2339b(g)(5)(B), and the defendant's offense need not itself be 'calculated' as described in § 2339b(g)(5)(B)." United States v. Awan, 607 F.3d 206, 315 (2nd Cir. 2010). In that case, the defendant had committed money laundering, in addition to material support of terrorism, and the government sought a terrorism enhancement under § 3A1.4(a) for the money laundering count. Id. at 311. The Court held that the application of the adjustment requires only that the defendant's offense was intended to promote a federal crime of terrorism as defined in § 2339b(g)(5)(B). Id. at 316.

Here, it is clear that defendant's crime of false statement in a passport application was intended to further or bring about the crime of material support to a foreign terrorist organization. Defendant had previously sought to depart the United States to join ISIL but could not do so because his passport had been taken from him. Undeterred, he lied in order to obtain another passport on an expedited basis. The very day he received that passport, he made his plane reservation to Turkey, and the next day went to the airport where he tried to use his fraudulently obtained passport to leave the United States and join ISIL, including by presenting the passport to the airline agent as he sought to check in for his flight to Turkey.

14

Ultimately, even if the Court declines the parties' contention that the terrorist enhancement applies to Count Two, it would not change the final guideline calculation because the calculation for Count One would control while the combined statutory maximums reduce the range to 300 months' imprisonment.

### 3. Defendant's Age (§ 5H1.1)

The PSR recommends a downward departure based on defendant's age pursuant to § 5H1.1.  (PSR ¶ 100.)  The Court should deny a reduction for age because defendant's age is not present to an unusual degree.  Defendant has the burden of proof when requesting a downward departure.  United States v. Howard, 894 F.2d 1085 (9th Cir. 1990).  Defendant must prove he is entitled to such a departure by a preponderance of the evidence.  United States v. Wilson, 900 F.2d 1350 (9th Cir. 1990).

The government objects to a downward departure based on defendant's age.  Defendant committed the offense when he was 19. This age is not an unusually young age for committing offenses, including federal crimes of terrorism.  Additionally, while incarcerated for two years, defendant has not demonstrated that with age, he has matured and recognized his errors in judgment.  To the contrary.  As discussed below, defendant has adopted ISIL's violent ideology as part of his identity and there is no reason or evidence to suggest in any way that it was his age that contributed significantly to him committing this offense.

### 4. Defendant's Mental Condition (§ 5H1.3)

The PSR recommends a downward departure based on defendant's mental condition pursuant to § 5H1.3.  (PSR ¶ 100.)  Defendant did not prove by a preponderance of the evidence that he meets the

15

standards for a departure based on mental and emotional condition
and the government objects to the PSR's departure recommendation
based on this factor.

In § 5H1.3, the Guidelines allow for a departure based on
"mental and emotional conditions" and "to an unusual degree and
distinguish[es] the case from the typical cases."  This provision
has been understood to mean that a defendant's mental and emotional
condition is relevant in the extraordinary case and as provided in
Section 5K2.13.  See United States v. Doering, 909 F. 2d 392, 394
(9th Cir. 1990).

Defendant was evaluated by Dr. Saul Faerstein, who reviewed
defendant's prior mental health treatment, the three hour video
recording and transcript of the July 2, 2014 FBI interview of
defendant, defendant's jail phone calls made after his arrest,
defendant's handwritten notes, and mental health tests, among other
items.  (See Saul Faerstein Expert Report ("Faerstein"), pages 1-2.)
Dr. Faerstein concluded that at the time of the offense, defendant
"had the ability to reason, to plan, to think rationally, to
calculate, to deliberate and to justify his actions."  (Faerstein,
p. 16.)  Defendant knew right from wrong.  Although defendant had a
lengthy history of interactions with mental and medical health
professionals, Dr. Faerstein concluded that, contrary to the PSR's
view, defendant did not and does not have Autism or Asperger's
Syndrome.  (Id., p. 9.)

Dr. Faerstein stated that defendant's "thought process
continues to be rigid and infused with a religious and political
ideology which is inflexible in the face of factual and intellectual
confrontation."  (Faerstein, p. 18.)  Dr. Faerstein concluded that

16

defendant "has a personal, an emotional, and a psychological investment in the ISIS entity and ideology because it defines who he has become."  (Id.)

However, this expert assessment does not qualify defendant's case as extraordinary; nor does he so qualify under § 5K2.13. First, defendant's mental condition is not extraordinary.  As described by Dr. Faerstein, and agreed upon by defendant's own expert, defendant experienced, at most, Major Depressive Disorder and Post Traumatic Stress Disorder.  Dr. Faerstein did not find that he suffered from these disorders at the time of the offense. Instead, Dr. Faerstein concluded that at the time of the offenses, defendant was able to plan, think rationally, and make deliberate choices.  This was based on Dr. Faerstein's complete review of the records, including watching and listening to defendant's three hour interview at the time of the offense.  Defendant's expert did not watch or listen to the interview, but instead relied upon a transcript prepared by defense counsel.  However, even if defendant's expert was correct, and the government contends that she was not, her diagnosis of defendant at the time of the offense does not rise to the level of an "unusual degree" and "distinguish the case from the typical case" as required by the Guidelines.

The Probation Officer relied upon defendant's self-report that he had Asperger's condition (PSR ¶ 71) but mistakenly concluded that defendant "was born with Asperger's and diagnosed with the disorder at age 14" (Id. at ¶ 69).  The medical records cited in the PSR actually state that defendant did not have Asperger's or autism, and instead described a secondary finding of "autistic-like." (Faerstein, p. 9.)  Dr. Faerstein explained in his report that this

17

is not a diagnosis of autism.  (Id.)  Additionally, at the time the

Probation Office wrote the PSR in October 2015, he did not have the

benefit of both the government's and defendant's expert reports.

These reports were completed in 2016, and they both concluded that

defendant did not have autism or Asperger's disorder at any time.

Second, defendant does not meet the requirements under

§ 5K2.13.  This section, which allows for a departure based on

diminished capacity, provides that the departure does not apply in

cases where:

> (2) the facts and circumstances of the defendant's
> offense indicate a need to protect the public because
> the offense involved actual violence or a serious
> threat of violence; . . . .

Id.

Here, the facts and circumstances of defendant's offense of

attempting to provide material support to a foreign terrorist

organization certainly indicate the need to protect the public from

his serious threat of violence – it is hard to imagine a more

serious such threat than that posed by ISIL or inspired by ISIL.

The Probation Officer recognized as much when he recommended a

lifetime term of supervised release because he was concerned "about

Dandach's extreme views, and demonstrated not only by the offense

but also Defendant's post-offense conduct espousing violent ideology

and support for terrorist activities, and the risk Defendant would

pose to the public if he were to still hold those views when

released from custody."  (PSR Letter, p. 7.)

Thus, defendant cannot prove by a preponderance of the evidence

that he has a mental and emotional condition that is to an "unusual

degree" and "distinguish[es] the case from the typical case."  Dr.

Faerstein opined that he did not suffer from a mental health condition at the time of the offense.  And even if defendant's expert opinion is reliable, and the government contends that it is not, the diagnosis does not rise to the level of unusual and distinguishable from other cases.  Additionally, defendant is not eligible for a diminished capacity departure based on the need to protect the public.

### 5. Defendant's Purported Physical Condition (§ 5H1.4)

The PSR recommended a departure based on defendant's physical condition.  (PSR ¶ 100.)  Stated simply, the Court should deny a reduction for physical condition because the defendant does not have a physical condition.  Apparently, the PSR concluded that defendant suffered from a physical condition because of the mistaken belief that he had Asperger's (Id. at ¶ 69) and because defendant weighed over 500 pounds three years prior to sentencing and over one year prior to committing his offenses.  Putting aside whether a would-be terrorist's high body weight should ever be an appropriate basis for a reduced sentence, defendant never had Asperger's and at the time of the offense was not overweight.  There is no basis for a departure.

As described above, neither the government's nor defendant's mental health expert diagnosed defendant with Asperger's Syndrome.  The PSR concluded he had Asperger's Syndrome from defendant's self-report that was not supported by expert opinion.  Similarly, defendant's claims of Asperger's effecting his motor skills, social interactions, and intellectual processes are without basis in fact.  The evidence at the evidentiary hearing show that defendant

1  demonstrated none of these problems on the date of his offenses.

2  (04/21/2016 RT, pp. 19-24.)

3       While it is true that in early 2013, defendant weighed over 500

4  pounds, at the time of the offense, he had lost over 250 pounds. In

5  February 2013, he received the benefit of a gastric bypass surgery

6  while he was receiving social security disability benefits.  He

7  dramatically lost weight and was lifting weights and running several

8  times a week.  Since he has been detained, he has maintained his

9  lower weight, and his better health.  There is no basis in law or

10 fact for a departure based physical condition.

11      **B.   Nature and Circumstances of the Offenses**

12      The nature and circumstances of the offenses are detailed at

13 length above, and warrant the government's recommended sentence.

14 Defendant had been planning for over a year to join ISIL, a

15 murderous terrorist organization that he knew committed horrifically

16 violent acts.  He possessed videos of their decapitations and

17 pictures of their atrocities on his cellular telephone.  Defendant

18 admitted that ISIL committed these atrocities to instill fear in its

19 enemies.  He admitted that he intended to pledge allegiance to the

20 leader of ISIL.  And, he admitted that he would do whatever ISIL's

21 leader asked of him.  Defendant watched ISIL training videos prior

22 to his attempt to travel to join them.  At approximately the same

23 time he was listening to terrorist lectures and sharing them with

24 his online friends, he began lifting weights and running.  He

25 communicated with fighters who were already on the battlefield.  He

26 regularly received updates of the ISIL battles.  He had maps of the

27 areas controlled by ISIL.  He admitted that he was going to a

28 battlefield and he would need to be trained to handle weapons.  He

20

sang jihadi *nasheeds* claiming "I am a terrorist" in the months leading up to his attempted travel.  He told his social media friend that he wished to fight one day.  And, on the day he attempted to travel to join ISIL, he told his friend, "Idk [I don't know] how people expect a khilafah [the Islamic State] to arise without bloodshed and fitnah these days."  Defendant intended to provide himself to ISIL, a foreign terrorist organization, and he intended to commit violent acts.

Even after his arrest and detention, defendant has not demonstrated that he has learned from his actions.  Instead, from his detention facility, he immediately involved his family in trying to destroy evidence of his communications with like-minded persons. He continues to support ISIL, telling the psychiatrist for the government that "Muslims who do not fight for the implementation of Sharia law are backstabbing other Muslims."  After a horrific terrorist attack in Paris, he wrote a poem attacking the victims and supporting the terrorists, stating "Je Suis Al-Qaida," French for "I am Al-Qaida," a cruel mockery of the victims of the Paris attack and the harm inflicted on that city.  The nature and circumstances of the offenses speak for themselves and warrant a significant term of imprisonment.

C.   **History and Characteristics of the Defendant**

The PSR provides details regarding the defendant's possible physical abuse as a child and his father's deportation in 2008. However, as an adult, defendant's brother, who experienced much of the same home environment as defendant, did not seek to join a terrorist organization.  This court sees many persons who have troubled childhoods.  The choice to join a foreign terrorist

organization, or to continue to support that terrorist organization, even after their incarceration, is not the usual response to a difficult childhood.  Although the defendant did not have a wealthy lifestyle, he had financial support, he had an older sister and brother who supported him, he graduated from high school, he was successful in his classes in college, and there were many other opportunities he could have chosen.  The mitigating factors of defendant's childhood difficulties, if any, his age at the time of the offense, and his emotional experiences are more than accounted for in the government's agreement to reduce the maximum sentence it would request by five years.

> ### D. Seriousness of the Offense, Respect for the Law, Adequate Deterrence, and Just Punishment

Defendant's offense and the circumstances surrounding it as described in this case are extremely serious.  Defendant's communications as well as his actions demonstrated his commitment to extremist principles, his support for a designated foreign terrorist organization, and his desire to engage in violent acts in furtherance of those extremist principles.  These facts show that the defendant's conduct was serious with the potential for harm and loss of life had his conduct not been discovered.  Further, defendant maintains those extremist views even now and seeks to spread his views through his writings.  A significant term of imprisonment followed by the maximum period of supervised release is necessary to promote respect for the law, and to deter defendant himself, and others.  The United States faces significant threat from terrorists' acts planned or committed by homegrown violent extremists like defendant who become radicalized online and seek to

engage in terror and support groups like ISIL.  A substantial
sentence here can provide deterrence to defendant and others from
engaging in this type of conduct.  The government's recommended 240-
month sentence is both just and commensurate with defendant's
conduct.

### E.    Protection of the Public and Need to Provide Defendant with Training or Correctional Treatment

It is essential that the Court's sentence "protect the public
from further crimes of the defendant."  18 U.S.C. 3553(a)(2)(C).
When evaluating the defendant's future dangerousness, and the need
for the sentence to protect the public from further crimes by
defendant, the offense conduct here is compelling.  As discussed in
detail above, this defendant remained undeterred in his goal to
provide himself to ISIL.  Additionally, the record shows that the
defendant has maintained his support for terrorism.  As Dr.
Faerstein opined, the "prognosis for him to become a tolerant,
broadminded person with more moderate and less dangerous goals is
guarded."  (Faerstein, p. 20.)  The government's recommended
sentence will help protect the public and achieve the objective goal
of this statutory sentencing factor.

### F.    Kinds of Sentences Available and Policy Considerations

Defendant's advisory guideline range, based on a total offense
level of 37 and a criminal history category of VI, is 360 months to
life imprisonment.  (PSR ¶ 86.)  However because the combined
statutory maximum is 25 years, the guideline range was adjusted to
300 months.  The government contends that a total sentence of 240
months (20 years) imprisonment with lifetime supervised release is
an appropriate sentence for a violation of both attempting to

provide material support to ISIL and making a false statement in a passport application.

### G.   Need to Avoid Sentencing Disparities

Section 3553(a)(6) is designed to avoid disparities in sentences between any one defendant and other defendants in other cases and in other districts. United States v. Saeteurn, 504 F.3d 1175, 1181-82 (9th Cir. 2007) (noting that the purpose of "§ 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case").

A sentence of imprisonment of 240 months' imprisonment and a lifetime term of supervised release is, taking into account the other factors and considerations set forth herein, likely to avoid a disparity with other cases nationwide, particularly where the total offense level is 37 and 240 months' imprisonment is below the resulting advisory Guidelines range. See United States v. Becerril-Lopez, 541 F.3d 881, 895 (9th Cir. 2008) ("Indeed, in the absence of any compelling argument about Becerril's particular circumstances, we have trouble imagining why a sentence within the Guidelines range would create a disparity, since it represents the sentence that most similarly situated defendants are likely to receive.").

The government's recommended sentence is consistent with recent cases of people convicted of attempting to join foreign terrorist organizations and apprehended en route, taking into consideration the defendant's particular characteristics as described above. (See Attachment 6.)

///

///

24

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully submits that an appropriate sentence for defendant is 240 months' imprisonment, lifetime term of supervised release, and a $200 mandatory special assessment.