Pal Lengyel-Leahu  CA SBN147153
Imhoff & Associates, P.C.
Los Angeles, CA 90025
(310) 315-1100 phone
(310) 566-5169 fax
plitigate@aol.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>      vs.<br><br>ADAM DANDACH,<br><br>            Defendant. | Case No.: SA CR 14-109-JVS<br><br>Sentencing Memorandum |

      The Presentence Investigation Report provides a detailed history of the case before the court and the defendant Adam Dandach. Probation calculated the defendant's sentencing guideline range as 37 with a category IV for criminal history with a recommendation of 300 months imprisonment and restitution of $20,000 to $200,000. This paper and accompanying letters of support offer grounds for the court's consideration of a further downward adjustment based upon the mitigating factors before the Court.

## THE DEFENDANT

**The History and Characteristics of the Defendant**.

1

In United States v. Booker, 543 U.S. 220, 245 (Jan. 12, 2005), the Supreme Court held that the sentencing guidelines are advisory only, not mandatory.  The other factors set forth in 18 U.S.C. § 3555 (a) must also be considered in fashioning the appropriate sentence. See United States v. Ameline, 400 F.3d 646, 655-656 (9th Cir. Feb. 9, 2005) (advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence").

These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for law and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant; to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, the need to avoid unwarranted sentencing disparities, and to provide restitution to the victims.

The district court may now consider even those mitigating factors that the advisory guidelines prohibit:  e.g., poverty, racial discrimination and humiliation, drug abuse and addiction, dysfunctional family background, lack of guidance as a youth, etc. Ameline; United States v. Ranum, 353 F.Supp.2d 984 (E.D. Wisc. Jan. 19, 2005) ("The guidelines' prohibition of considering these factors cannot be squared with the Section 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant'); U.S. v. Myers  353 F.Supp.2d 1026 (S.D.Iowa,2005) ("The guidelines prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant....Thus, in cases in which a defendant's history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the

guideline range")   See also 18 U.S.C. § 3661( "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Consider also that Congress had directed that the district court "shall impose a sentence sufficient, but not greater than necessary, to comply with [the purposes of sentencing]" (emphasis added). 18 U.S.C. § 3553(a).  This is the "primary directive" of the sentencing statute.

Remember also that The Supreme Court said in Koon v. U.S. , 518 U.S. 81, 113 (1996), that "[i]t  has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

Even before Booker, the Sentencing Guidelines "place[d] essentially no limit on the number of potential factors that may warrant a departure."  Koon 518 U.S. at 106; U.S.  v. Coleman, 188 F.3d 354, 358 (6th Cir.1999) (en banc) (there are a "potentially infinite number of factors which may warrant a departure"); 18 U.S.C. §3661 ("no limitation shall be placed on the information" a court can receive and consider for purposes of imposing an appropriate sentence). A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the guidelines."  Even when the guidelines were mandatory, they did not "displace the traditional role of the district court in bringing compassion and common sense to the sentencing process….In areas where the Sentencing Commission has not spoken . . . district courts should not hesitate to use their discretion in devising sentences that provide individualized justice." U.S.  v. Williams, 65 F.3d 301, 309-310 (2d Cir. 1995);  "It is important, too, to realize that departures are an important part of the sentencing process because they offer the opportunity to

3

ameliorate, at least in some aspects, the rigidity of the Guidelines themselves. District judges, therefore, need not shrink from utilizing departures when the opportunity presents itself and when circumstances require such action to bring about a fair and reasonable sentence." U.S. v. Gaskill, 991 F.2d 82, 86 (3rd Cir. 1993). "The Guidelines are not a straightjacket for district judges." U.S. v. Cook, 938 F.2d 149, 152 (9th Cir. 1991); The Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom." U.S. v. Dominguez, 296 F.3d 192, 196 n. 7 (3rd Cir. 2002) (quoting U.S. v. Johnson, 964 F.2d 124, 125 (2d Cir.1992)); ." U.S. v. Blarek II, 7 F.Supp. 2d 192, 211 (EDNY 1998) ( "To impose the harsh sentence suggested by Probation and the government under the Guidelines without appropriate downward departures would amount to an act of needless cruelty given the nature of the crimes committed and the personal circumstances of these defendants"). Finally, remember that "[i]f the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm." U.S. v. Myers, 353 F.Supp.2d 1026, 1027 (S.D.Iowa Jan. 26, 2005)

Adam Dandach appears before this Court a broken and confused young man. His personal biography cries out for the Court's attention and consideration in fashioning the punishment appropriate for someone suffering from the circumstances of his life and the predicament in which he finds himself.

Adam's mother divorced her first husband after years of his abuse and criminal behavior which became intolerable. Unfortunately, her choice of partner was no better the second time as she married a horrible man who abused her and her children repeatedly, engaged in all manner of criminal conduct, and was ultimately removed from the family environment and finally deported from the United States.

The terrible toll his abuse reigned on this family completely destroyed any possibility of normalcy for any of the victims and it was the children who managed to flee from him that were able to fashion a life for themselves.  Adam's tender age prohibited his escape and even after the monster was removed, Adam was without a support system or a parent figure that had the skills to help him in his youthful quest for relevance.  Adam suffered emotionally, physically, spiritually and psychologically throughout his adolescence.  He was treated for all manner of psychological disorders including depression and post-traumatic stress disorder, physical and emotional abuse, obesity, anxiety, ADHD, Aspergers, psychiatric emergency "5150," suicidal ideation, major depression disorder, hearing voices, panic attacks, and physical outbursts, paranoia, and low self-esteem. He went to therapy, special counselling, home schooling (to avoid bullying), and was involuntarily hospitalized 5150 as a danger to himself or others.  In short, his entire childhood and adolescence was devastated by the repeated abuse he was suffered as the results of choices made by his mother and the absence of any support at home.

It wasn't until after his gastric bypass surgery and his religious conversion that Adam found a purpose to his life.  Unfortunately, the only source of people he could find who were willing to listen and support him were found on the internet with all its unknown dangers to the simple, troubled mind of a young man completely alone in the world.

The hook for Adam was doing the Lord's work, the work of Allah.  In his mind, he could find the purpose of his life if he could discover God's Will and then set about doing that which would make God happy.  He studied the Koran.  He listened to lectures.  He read profusely.  And he attended religious services.  All of these were done and carried out with the energy of his youth and the vigor of a convert who was uncompromising in his zeal.  For Adam, his politics and his religion were entwined and he was incapable of separating or moderating his beliefs.  But

5

his driving force was a true compassion and sympathy for those who were oppressed.  It was based upon these motives alone that he made the fateful decision to try and go over to the war torn lands of the Middle East and do what he could to alleviate the suffering of others.

Adam's personal politics is not so very different from many other moderate people.  He sees the situation created in Iraq and yearns for a three state solution to the sectarian violence that has plagued the region since the time of Saddam Hussein.  Adam is likewise opposed to the rule of Assad in Syria and joins with millions of people throughout the world, including our own government, which seeks an end to the abuse his administration meted out in that country.  The turning point for Adam was when his own country refused to enforce the "red line" prohibiting the use of chemical weapons on civilian populations when he realized that his own country was not going to do anything to stop the violence.

But there is nothing in all of Adam's history that speaks of a militant.  He had no aspirations to join in any fighting and thoroughly believed he would be incapable of any such actions.  His humanitarian desires were to simply immigrate to the land that professed his religious beliefs, be surrounded by those with similar beliefs, and make his way in the world the best he could.  This was the motivating factor that led him to attempt to join the charitable convoy when it reached Istanbul in the winter of 2013.  Yet the government urges the Court to adopt the ridiculous position that Adam should be punished for writing poetry.  Poetry, for Adam, is therapeutic to help him fill the hours of his life with reflection and purpose.  Of course he doesn't write love sonnets.  He has never felt the hand of a woman on his cheek.  He doesn't write nursery rhymes.  He has never heard any.  He writes of things that he knows, or imagines, but that doesn't mean he agrees with the point of view portrayed in his writings.  He is merely being provocative and exploring a medium that is universally accepted as means to grapple with

6

our demons.  Adam has never hurt a fly.  He simply looks at life from a different perspective but consistently from a point of view where he attempts to please God in the manner that his religion has revealed to him.

It was Adam's mother and family that interceded and through their actions of taking his passport, they prevented him from travelling.  Without their joined efforts, Adam would have made it over there and this case would never have been brought.  In this way, Adam is unlike many of the other, similar cases that have been addressed throughout the country.  Adam has a family that has demonstrated that they wish to keep him safe and protect him from his own desires.  Adam has resources that he was not even aware of and did not appreciate at the time.

The historical timing of events also sheds light on Adam's culpability.  In 2013, ISIS/ISIL was not a recognized foreign terrorist organization by the US government.  In fact, President Obama famously declared terrorism was essentially wiped out in Iraq and this group was a "junior varsity" squad.  Well, in about February or March of 2014, this JV squad essentially declared war on al-Qaida and the two groups have been fighting against each other ever since.  It wasn't until May 15, 2014, that the State Department had ISIS/ISIL added to the Federal Register as a foreign terrorist organization.  A month later, after the fall of Mosul in Iraq, the leader of ISIS/ISIL, Abu Bakr al-Baghdadi, formally declared a new caliphate, with himself as the head, and this new entity would thereafter be known as the Islamic State.  The Islamic State was inexplicably kept off the foreign terrorist organization designation until September 30, 2015.

At the time of the declaration of the caliphate, Adam believed this was an answer to prayer.  That the caliphate would rise as a model of Muslim virtue in the world and he wanted to be a part of these events, like thousands of like-minded individuals from around the world.  But

the Court should recognize that Adam was arrested at the beginning of July 2014. This was well before the world learned of the beheadings of journalists and social workers, before the burning of a Jordanian pilot, before the killing of Christian Coptics on the beach in Libya. While it may be true that a revolution, or civil war, must necessarily involve bloodshed to overthrow tyranny, Adam abhors the loss of innocent civilian life and he is convinced the perpetrators of such atrocities do not act with the true intentions of his Islamic faith.

## MITIGATING FACTORS

The court should give some consideration to reduction based upon mitigating role as outlined in §3B1.2 for a defendant's minimal role in criminal activity and recommend a decrease by 4 levels. Mr. Dandach was charged and pleaded guilty to material support of a foreign terrorist organization (18 U.S.C. §2339B). On 2 July 2014, Mr. Dandach went to John Wayne Airport to board a flight to Istanbul Turkey. Upon seeing him, the FBI agents pulled him over and talked with him. After talking to the FBI agents, Mr. Dandach went home and abandoned his plans to fly to Turkey. It was the next day, 3 July 2014, Mr. Dandach was arrested, long after his "attempt" to travel to Turkey and after the FBI had made such travel a factual impossibility by seizing his replacement passport. Clearly, Mr. Dandach's actions were extremely minimal in carrying out material support for ISIL. The government's case is nothing more than fear mongering, suspicion, and political hyperbole. They intentionally ignore Mr. Dandach's stated intentions and lack of evidence of any plan or planning. There is a huge divide from an Orange County kid getting a ticket out of John Wayne and another kid, whose finger is on a trigger. Mr. Dandach made it clear to the FBI agents and the court that his intentions were to provide charitable support to those living in the caliphate and a religious conviction that in order to be a good Muslim, he would have to live under the Caliphate established by Abu Bakr al Baghdadi.

8

The third pillar of Islam, known as Zakat, commands the faithful to give alms or charity to the needy. Mr. Dandach sought to live according to the teachings of his faith and did not have any violent intentions.  Lastly, the government wants to portray him as a ticking time bomb, ready to explode and wreak havoc at anytime. There is not a shred of evidence they have provided to show that Mr. Dandach has violent tendencies or a plan to commit acts of terror.  Instead, the government argument rests entirely on the assertion that the FBI could find no evidence of charitable causes researched on Defendant's electronic media.  This is not surprising or even instructive as Adam told them this information was contained in printed literature in his home because he could not find such resources generally available on the internet.  The FBI elected not to search or seize this library in Mr. Dandach's apartment.

**The advisory guideline "greater than necessary" or too draconian, and the purpose of sentencing is satisfied by a sentence below the guidelines.**

U.S. v. Jones, 352 F.Supp.2d 22 (D.Me.,2005)(post Booker, where mentally ill defendant convicted of possessing firearm and guidelines are 12 to 18 months, and where he doesn't qualify for other downward departures, and because guidelines only advisory, a sentence below the guidelines to Zone C (6 months—time served) will better insure continuing medical care, or other correctional treatment in the most effective manner and "the marginal protection to the public afforded by a few more months in prison is more than offset by the increased risk upon this defendant's later release after the interruption of his treatment and other regimens" So the sentence imposed "will in all likelihood better protect the public over the long term.");

United States v. Redemann, 295 F. Supp. 2d 887 (E.D. Wisc. 2003) (in bank fraud case where guidelines were 18-24 months, court departed downward two levels in part because case outside the heartland and the guideline sentence was "greater than necessary" to satisfy the

"purposes" of sentencing 5K2.20.  "Courts have long recognized that where the sentence called

for by the guidelines would result in punishment greater than necessary the court can depart

downward."  Here defendant had been civilly prosecuted by the office of the comptroller of the

currency and had to pay $75,000, suffered adverse publicity in small town, ruined his business,

and caused ill health and ultimate death of his wife—so "the primary purposes of sentencing

were partially achieved before the case was filed....and [the collateral punishment] partially

satisfied the need for just punishment—district judges may consider such successive

punishments ...in deciding whether to depart...."; also general deterrence achieved given what

happened to the defendant );  United States v. Gaind, 829 F.Supp. 669 (S.D.N. Y. 1993)

(departure granted in part because the destruction of the defendant's business already achieved to

a significant extent some although not all of the objectives otherwise required to be sought

through the sentencing process so 18 U.S.C. section 3553(a), which states that "court shall

impose a sentence sufficient, but not greater than necessary" to achieve the purposes of

sentencing "requires me to depart downward from the Guidelines"), aff'd, 31 F.3d 73 (2nd Cir.

1994).

      The advisory guidelines are overly harsh or draconian. See United States v. Stockton 968

F.2d 715, 721 (8th Cir 1992)  (Bright, Senior Judge, Concurring) ( guideline sentence "have

gone awry" with sentence of  20 years for first time meth offender and is  "excessively  long"

and "greater than necessary" and "cannot be justified in a civilized society");  United States v.

Andruska, 964 F.2d 640, 646-47 (7th Cir. 1992)(Will, Senior Judge, concurring) ("the

irrationality and draconian nature of the Guidelines sentencing process is again unhappily

reflected in this case");  United States v. England, 966 F.2d 403, 410 (8th Cir. 1992) (Bright, J.,

concurring)(Although not illegal, the "draconian" sentences in this methamphetamine case

"emanate from a scheme gone awry.").  United States v. Harrington, 947 F.2d 956, 964 (D.C. Cir. 1991) (Edwards, J., concurring) (the guidelines "often produce harsh results that are patently unfair because they fail to take account of individual circumstances...."); U.S. v. Molina, 963 F.Supp. 213, *215 (E.D.N.Y.,1997)(commenting on "[t]he all-too-familiar harshness required by rigid federal Guidelines...and the depredations they wreak upon individual defendants and their families.")

### Criminal Conduct Atypical And Outside The Heartland Of The Guideline.

USSG ch.1. Pt A comment 4(b)(departure proper where conduct "atypical" and "significantly differs from the norm" of conduct covered by the guideline); Koon v. U.S., 518 U.S. 8, 100 (1996) ("the severity of the misconduct, its timing, and the disruption it causes" are factors which influence a district court's determination of whether the misconduct in a particular instance makes the case atypical); U.S.  v. Parish, 308 F.3d 1025 (9th Cir. 2002) (eight level departure granted in child porn case because defendant's possession of photographs, which were automatically downloaded when he viewed the documents, was outside the heartland of much more serious crimes that typical pornographers engage in, according to psychiatrist) [distinguish U.S. v. Thompson, 315 F.3d 1071 (9th Cir. 2002) (no departure because not outside heartland where D not only  deliberately possessed but also distributed porn)];  U.S.  v. Sicken, 223 F.3d 1169 (10th Cir. 2000) (where anti-nuclear protestors, convicted of sabotage, destroyed property at missile sight but posed no real danger to national security, four level departure proper because district court could consider that guideline failed to adequately consider range of seriousness of sabotage offenses and this case outside the heartland); U.S.  v. Sanchez Rodriguez, 161 F.3d 556, 561 (9th Cir. 1998) (en banc) (affirming downward departure in sentencing for illegal reentry following aggravated felony based on minimal amount of drugs involved in underlying felony);

11

U.S. v. Stockheimer, 157 F.3d 1082, 1091 (7th Cir.1998) (noting permissibility of downward departure where intended loss related to fraud conviction overstated seriousness of offense in comparison to realistic possibility of actual loss);

U.S. v. Rosenthal, 266 F.Supp.2d 1068 (N.D. Cal. 2003) (Breyer, J.) (in marijuana case, downward departure to one day in jail from 30-month range granted because defendant reasonably believed he was authorized by city of Oakland to grow marijuana for medicinal purposes taking this outside the heartland of drug cases); U.S. v. Allen, 250 F.Supp.2d 317 (SDNY 2002)(Where D convicted of drugs and guns, D entitled to 8 level departure under USSG 5K2.0 from 80 months to 30 months because his mental immaturity-even though 21 behaves like 14 year old and psychological problems and mild retardation take case out of heartland of drug and gun cases);  U.S.  v. Singh, 224 F.Supp.2d 962 (E.D.Pa. 2002) (where defendant illegally reentered in order to visit his dying mother and only intended to stay in country one week –as evidenced by airline ticket—departure from 37 months to 21 months proper); U.S.  v. Koczuk, 166 F.Supp. 2d 757 (ED.N.Y. 2001) (where D acquitted of five counts of illegally importing caviar but convicted of single count with market value less than $100,000, but where co-D convicted of six counts of importing  $11million dollars worth, offense level "has been extraordinarily magnified by a circumstance that bears little relation to defendant's role in the offense" – here D's role in conspiracy "bore little correlation to 11 million dollars because D "was not actively involved in co-D business was "merely a low level employee – chauffeur and interpreter – who "took orders from co-D"4-level minimal role reduction simply not adequate); U.S.  v. Nachamie, 121 F.Supp.2d 285, 297(S.D.N.Y. 2000) (the circuit has recognized that a district court can consider a defendant's initial lack of intent in granting a downward departure under §5K2.0.  That defendants did not join Nachamie's scheme with criminal intent – and then

operated for an additional period of time with "diminished" intent – makes this an "atypical" case that "significantly differs from the norm" and therefore falls outside the "heartland" of the fraud Guidelines.).

### The Defendant's Crime Constituted a Brief Period of Aberrant Behavior.

Effective Nov. 1, 2000, a departure for aberrant conduct is authorized but only for "a single criminal occurrence or single criminal transaction that was committed without significant planning, was of limited duration, and represented a marked deviation from an otherwise law abiding life." 5K2.20  App. Note 1.  Further, this departure is unavailable if (1) offense involved serious bodily injury or death, (2) use or discharge of a firearm, (3) a serious drug trafficking crime, or (4) the defendant has more than one criminal history point. Under this standard, "The Sentencing Commission specifically rejected a rule that would have allowed a departure for aberrant behavior only in a case involving a single act that was spontaneous and seemingly thoughtless...The Commission saw the need to define aberrant behavior more flexibly and to slightly relax the single act" rule." U.S.  v. Gonzalez, 281 F.3d 38  (2nd Cir.  2002).

That said, see United States v. Smith, 387 F.3d 826 (9th Cir. 2004) (where D convicted of retaliating against a witness (18 U.S.C. 1513(b)(2)), case remanded to district court to reconsider its refusal to grant aberrant behavior departure, noting the fact that defendant may have had time to plan the offense does not mean it was the result of "significant planning," and that crime lasted for ten minutes does not mean it lasted a long time; and that the conduct was indeed extraordinary); U.S. v. Vieke, 348 F.3d 811 (9th Cir. 2003) (because government made only pro forma objection, court of appeals refuses to review district court's four level downward departure to probation in credit card fraud case where district court said crime committed because of

"pathological nature of the [gambling] addiction" and was "totally out of suit with the rest of her life and the behaviors" even though fraud went on for years).

U.S. v Myers, 353 F.Supp.2d 1026 (S.D. Iowa Jan. 26, 2005) (where D 40 years of age with no record and lead blameless life convicted of unlawful possession of short-barreled shotgun he sold to his cousin four years earlier, and where advisory guideline 20-30 months, departure to time served and three month term of supervised release because of aberrant conduct and because other purposes of sentencing satisfied).

**The Defendant Suffered Extraordinary Physical And Sexual Abuse As Child.**

U.S. v. Walter, 256 F.3d 891 (9th Cir. 2001)(where D sent threat to the president, district court could downward depart from 41 months sentence because combination of brutal beatings by defendant's father, the introduction to drugs and alcohol by his mother, and, most seriously, the sexual abuse defendant faced at the hands of his cousin, constituted the type of extraordinary circumstances justifying consideration of the psychological effects of childhood abuse and establish diminished capacity); U.S. v. Brown, 985 F.2d 478 (9th Cir. 1993) (where D offered a letter recounting his childhood of severe abuse and neglect and produced psychologist's report concluding that childhood trauma was the primary cause of D's criminal behavior, court could grant downward departure); U.S. v. Roe, 976 F.2d 1216 (9th Cir. 1992) (court clearly erred in holding it did not have discretion to depart downward where defendant's suffered extraordinary sexual abuse as a child); U.S. v. Rivera, 192 F.3d 81, 84 (2d Cir. 1999) ("It seems beyond question that abuse suffered during childhood – at some level of severity – can impair a person's mental and emotional conditions...in extraordinary circumstances...district courts may properly grant a downward departure on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense" but

defendant was not entitled to one here because he "failed to allege and show, as required for a §5H1.3 departure, that any abuse he may have suffered rose to the extraordinary level that can be assumed to cause mental or emotional pathology"); U.S. v. Pullen, 89 F.3d 368 (7th Cir. 1996) (in light of Koon v. U.S., 518 U.S. 81 (1996), sentence remanded to see if defendant can establish that childhood abuse was extraordinary to enable judge to exercise discretion to depart downward); see Santosky v. Kramer, 455 U.S. 745, 789 (1982) (Rehnquist, J., joined by Burger, C.J., White, and O'Connor, J., dissenting) ("It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens"); Motley v. Collins, 3 F.3d 781, 792 (5th Cir. 1993) (death penalty) (fact that a doctor did not opine that he murder was likely the result of child abuse did not preclude jurors from making the required inference "after all, the effects of child abuse are not peculiarly within the province of an expert . . . it requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive, citizens").

U.S. v. Ayers, 971 F.Supp. 1197 (N.D. Ill. 1997) (The departure granted based upon cruel childhood with relentless physical, sexual and psychological abuse over course of years).

The court can consider the defendant's troubled upbringing and his exposure to domestic violence as a child. U.S. v. Lopez, 938 F.2d 1293, 1298 (D.C.Cir. 1991); see U.S. v. Deigert, 916 F.2d 916, 918-19 (4th Cir. 1990); see Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (evidence about the defendant's background is relevant because of the belief "long held by this society, that the defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems may be less culpable than defendants who have no such excuse.")

**Disparity In Sentencing.**

U.S. v. Tzoc-Sierra, 387 F.3d 978  (9th Cir. 2004) (in drug case affirmed district court's downward departure from range of 46-47 months  to 36 months on basis of disparity of sentence received by codefendants); U.S. v. Caperna, 251 F.3d 827 (9th Cir. 2001) (where a defendant was a small player in large drug conspiracy, district court's downward departure to 36 months because of disparity in sentence of co-defendant vacated, but on remand the district court has discretion to depart downward because of disparity in sentence with other co-defendant as long as codefendant convicted of same crime); U.S. v. Daas, 198 F.3d 1167 (9th Cir. 1999) (defendant argued for departure based on disparity between his sentence and that of co-defendants, who turned into rats, but judge said it was not an legal ground. Reversed. "Downward departure to equalize sentencing disparity is a proper ground for departure under the appropriate circumstances . . . Indeed, a central goal of the Sentencing Guidelines is to eliminate sentencing disparity . . . Here, the record indicates that the district court believed incorrectly that it lacked the authority to depart downward based on sentencing disparity.  Because the district court actually had this authority but mistakenly failed to exercise it to determine whether the facts here warranted departure, this court remands for findings as to whether a downward departure is appropriate."); U.S.  v. Meza, 127 F.3d 545 (7th Cir. 1997) (an unjustified disparity, one that does not result from the proper application of he guidelines, "is potentially a sentencing factor to consider" because the goal of the guidelines is of course "to reduce unjustified departures."); U.S.  v. Boshell, 952 F.2d 1101, 1106-09 (9th Cir. 1991) (downward departure from 27 to 12 years upheld on ground that guideline sentence was disproportionately long compared to the 5 to 6-year sentences impose on codefendant who had been sentenced after the Ninth Circuit held the guidelines unconstitutional but before they were upheld by the Supreme Court); U.S. v. Ray, 920

16

F.2d 562 (9th cir. 1990), amended, 930 F.2d 1368, 1372-73 (9th Cir. 1991) ("disparity was said to be one of the most important evils the guidelines were intended to cure").

United States v. Galvez-Barrios, 355 F.Supp.2d 958(E.D. Wis. Feb. 2, 2005) (Adelman, J.) (post Booker, in illegal reentry case where Guideline range was 41-51 months, court imposes 24 months in part because of unwarranted disparity in sentences among § 1326 defendants in border areas); United States v. Huerta-Rodriguez, 355 F. Supp. 2d 1019(D. Neb. Feb. 1, 2005) (Bataillon, J.) (post Booker, in illegal reentry case, where guideline range was 70-87 months (57-70months after government concession), imposing sentence of 36 months in part because criminal history overrepresented and because "in other districts a similar defendant would not be prosecuted for illegal reentry, but would simply be deported");  U.S.  v. Clark, 79 F.Supp.2d 1066 (N.D.Iowa 1999) (unlike all districts, U.S.  attorney here does not give cooperating witnesses protection for incriminating statement under U.S.S.G. §1B1.8, so departure granted from 36 to 28 where eight levels were due to drugs he admitted to in his debriefing).

Attached hereto, as exhibit A, is a report by Center for National Security at Fordham Law, Case by Case  ISIS Prosecutions in the United States, March 1, 2014 – June 30, 2016, (http://www.centeronnationalsecurity.org/research)  which indicates the average sentence in the United States for ISIS prosecutions over the last two years is 9.2 years.  (See page 21)

The court should also consider a downward departure under §5K2.0(a)(1), which states the following:

"(1) IN GENERAL.-The sentencing court may depart from the applicable guideline range if -

(A) in the case of offenses other than child crimes and sexual offenses, the court finds, pursuant to 18 U.S.C. § 3553(b)(l), that there exists an aggravating or mitigating circumstance; or

(B) in the case of child crimes and sexual offenses, the court finds, pursuant to 18 U.S.C. § 3553(b)(2)(A)(i), that there exists an aggravating circumstance,

of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described."

Mr. Dandach did not show any violent propensities nor did he join ISIL, but merely wanted to aid those living under the caliphate in order to fulfill the third pillar of Islam, known as Zakat. The government has prosecuted the wrong kind of person, because he is not bent on killing and destroying. Secondly, this kind of offense has not been taken into consideration by the Sentencing Commission because the offense could not factually taken place within the United States. Since the offense was only an attempt and Mr. Dandach was arrest the day after being interviewed by the FBI at John Wayne Airport, the court should consider a downward departure from the guidelines, because neither crime nor terrorist attacked occurred in the United States of America.

The court should also consider a downward departure under §5K2.16, because Mr. Dandach voluntary disclosed his offense. After being arrested by the FBI, Mr. Dandach was completely cooperative and later pled guilty to his charges. Because Mr. Dandach was cooperative with the government and pled guilty, the court should consider a downward departure from level 37.

The court should consider a downward departure under §5K2.20, because Mr. Dandach exhibited a brief, fleeting period of aberrant behavior by trying to travel to territory under the control of ISIL. Mr. Dandach's actions of attempting to materially support a foreign terrorist organization only occurred once, without sufficient planning involved. After the FBI interviewed

18

Mr. Dandach, he returned home and ceased from trying to board a plan to Istanbul, Turkey. There were no substantial bodily injury, death, discharged firearms, drug trafficking, or prior criminal history. His participation in this scheme was a brief and uncharacteristic foray into aberrant behavior that is contrary to the fabric of the rest of his life. Although his life was marred with child abuse, and the myriad of psychological problems otherwise catalogued, he did not show any signs of violent or criminal behavior, but only wanted to help those in need. Therefore, the court should consider a downward departure from level 37.

The court should consider a downward departure under §5K2.13, because Mr. Dandach had been suffering from mental illnesses at the commission of his offense. Dr. Jasmine A. Tehrani testified that Mr. Dandach has suffered major depression and PTSD for most of his life. Mr. Dandach developed PTSD after being physically and sexually abused by his father when he was a child. He grew up alone, ostracized, and hopeless, because of his traumatic upbringing. In order to counteract his mental illnesses, Mr. Dandach wrote poetry and other writings, which gave him an outlet for his emotions. These writings provided a voice and a persona for Mr. Dandach, who constantly felt alone and trapped in an abusive environment. Mr. Dandach did not use alcohol or drugs and does not have any violent tendencies. Therefore, the court should consider a downward departure, because Mr. Dandach had a diminished capacity to understand what he was doing.

**The evidentiary hearing.**

The evidentiary hearing was instructive and useful to the Court on a number of significant levels.  The FBI agent testified that Adam repeatedly disavowed any militant intent

19

and stated repeatedly that he only wanted to immigrate to a land that subscribed to his religious beliefs.  He did not think himself capable of contributing in any significant way to the military goals of any organization because of his own physical limitations and his personality.

Dr. Faerstein demonstrated his own unique political bias throughout his report and in cross examination.  He detests Adam precisely because he disagrees with all religion, and perhaps most adamantly opposes Islam, as he made clear in his report.  He also disagrees with Adam's politics.  It markedly shows that his report and testimony were prejudiced by his social engineering and had little to do with the purposes of criminal justice, for which he was ostensibly hired.  His true colors were demonstrated when he voluntarily wrote to the Los Angeles Times and opined that Sirhan Sirhan should not be eligible for parole, not because the prisoner was deficient in the statutory mandate the parole board was supposed to consider regarding such matters, but exclusively because Dr. Faerstein disagrees with the politics that motivated the original criminal act.  As a scientist, he cannot be trusted.  As a witness for the government, with respect to Adam, he should not be trusted.

Defendant's own expert was both careful and thoughtful in her approach and indicated the need for Adam to continue to undergo counselling and therapy to help him deal with the issues he confronts and provide him with coping skills to make better judgments and choices in the future.

Defendant's brother gave detailed recollections of the abuse and trauma suffered by Adam and the lifelong struggles they have shared.  Remarkably, the government on cross suggested he was lying because the FBI could discover no evidence of any police involvement at

the Dandach household.  While we admonish juries not to take note of attorney's questions as they aren't evidence, the defense has uncovered multiple reports for the Court's consideration that corroborate the testimony and will be provided on the date of sentencing or sooner, if available.

For all the foregoing reasons, Mr. Dandach requests the court to consider a downward departure based upon mitigating circumstances for his sentencing.

Respectfully submitted,

PAL A. LENGYEL-LEAHU
IMHOFF & ASSOCIATES

DATED: July 13, 2016

_____
By: PAL A. LENGYEL-LEAHU
Counsel for Defendant

21