UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| Elsa Vargas | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **[IN CHAMBERS] Order Regarding Motion for Compassionate Release or Reduction in Sentence [144]**

Before the Court is Adam Dandach's ("Dandach") motion for compassionate release or, in the alternative, reduction in sentence. (Mot., Dkt. No. 144.) The government filed an opposition. (Opp'n, Dkt. No. 151.) Dandach filed a reply. (Reply, Dkt. No. 158.)

The Court also requested Dandach file supplemental information regarding an "Appendix A" that was referenced but missing from his brief. (Dkt. No. 159.) Dandach filed a supplemental brief with Appendix A. (Dkt. No. 162.)

For the following reasons, the Court **DENIES** the motion.

## I. BACKGROUND

*A.    Dandach's Charges and Guilty Plea*

The following is taken from the plea agreement (Plea Agreement, Dkt. No. 71), unless otherwise specified. On October 15, 2004, the United States Secretary of State designed al-Qa'ida in Iraq ("AQI") as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act. (Id. at 7.) On May 15, 2014, the designation of AQI as an FTO under Section 219 was amended to add the alias Islamic State of Iraq and the Levant ("ISIL") as a primary name, and other aliases including the Islamic State of Iraq and al-Sham ("ISIS"). (Id. at 7–8.) This designation was continuos between October 15, 2004 and the time of Dandach's guilty plea. (Id. at 8.) This designation continues today.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

    Beginning in November 2013, and continuing through July 2, 2014, Dandach attempted to travel from the United States to Syria to provide material support and resources, primarily himself, to ISIL.  (Id.)  Dandach knew that he would be working and aiding ISIL under ISIL's direction and control.  (Id.)  Dandach was motivated by his support for violate jihad against persons he "considered 'occupiers' of Afghanistan, Iraq, and Syria."  (Id. at 8–9.)

    Dandach made his first travel attempt to Syria in December 2013.  (Id. at 9.)  Approximately one month earlier, he had requested and received an expedited passport.  (Id.)  Dandach then booked a flight and intended to fly to Istanbul, Turkey, on December 25, 2013.  (Id.)  Upon learning of Dandach's travel plans, a family member took Dandach's passport and the money he intended to use to travel to Syria.  (Id.)

    Despite this hurdle, Dandach "continued to make plans to carry out his intention to provide material support and resources to ISIL."  (Id.)  Dandach corresponded with individuals in Syria, including at least one person fighting for ISIL, so that he could travel and work under the control of ISIL.  (Id.)  Dandach also "obtained information and guidance to achieve this purpose, including booklets on how to travel to Syria, flights to the area, and maps of ISIL-controlled areas."  (Id.)  Dandach then applied for an expedited passport in 2014 and falsely stated on his application that he had lost his 2013 passport when he "accidentally threw it in the trash in June 2013."  (Id.)  However, Dandach knew that a family member had taken it away in December 2013 and that he had not, in fact, lost it.  (Id.)

    On July 1, 2014, Dandach obtained his 2014 passport from the State Department.  (Id.)  On the same date, Dandach booked a flight from Santa Ana, California to Istanbul, Turkey, on July 2, 2014.  (Id.)  When Dandach arrived at John Wayne Airport in Santa Ana, he had luggage, including a laptop computer and smartphone.  (Id. at 10.)  On his smartphone, Dandach had downloaded "nasheeds (jihadi songs)" supporting ISIL fighting, maps of ISIL controlled areas, Twitter updates on ISIL fighting in Syria and Iraq, and a pamphlet on how to reach a Syrian border city from Istanbul.  (Id.)  On the same day, Dandach had emailed a friend and complained "how people expect a khilafah to arise without bloodshed" and that "it's a golden opportunity."  (Id.)

    On July 2, 2014, Dandach admitted to FBI Special Agents that he intended to fly to Istanbul, Turkey for the purpose of reaching ISIL-controlled Syria.  (Id.)  Dandach

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

intended to pledge allegiance to the leader of ISIL, Al-Baghdadi, that he intended to live under the control of ISIL, and that he was planning to take weapons training from ISIL to defend himself. (Id.) At this time, Dandach told agents that ISIL had declared a caliphate on June 29, 2014, and stated that it was mandatory for every Muslim who was able to migrate to the land of Islam. (Id.) He admitted that if someone wants to invade "our land, we have to fight back." (Id. at 10–11.)

      B.      *Court Sentences Dandach*

With regard to Count One, the PSR recommended a base offense level of 26, pursuant to USSG § 25M.3(a). (Revised Presentence Investigation Report ("PSR"), Dkt. No. 128, ¶ 27.) The offense level was increased by two points under § 2M5.3(b)(1)(E) for involving the provision of funds or other material support or resources with the intent, knowledge, or reason to believe they would be used to commit or assist in the commission of a violent act. (Id. ¶ 28.) The offense level was increased twelve points for involving a federal crime of terrorism. (Id. ¶ 29.) There was no adjustment for his role in the offense or for obstruction of justice. (Id. ¶¶ 30–31.) The adjusted offense level for Count One was set at 40. After a total three point reduction for acceptance of responsibility, Dandach's total offense level was set at 37. (Id. ¶ 47.)

With regard to Count Two, the PSR recommended a base offense level of eight (8) pursuant to USSG § 2L2.2(a). (Id. ¶ 33.) The offense level was increased by four points pursuant to USSG § 2L2.2(b)(3)(A) for fraudulently obtaining a passport. (Id. ¶ 34.) There was no victim related adjustment. (id. ¶ 35.) Dandach's adjusted offense level for Count Two was 12.

On June 2, 2016, the Court held an evidentiary hearing on sentencing factors, listening to testimony from health professionals called by both parties. (Dkt. No. 124.) The Court stated at the sentencing hearing that "the mental health experts presented somewhat contrasting views of Mr. Dandach's mental health, but the long-standing record established that he has and likely still has significant mental health difficulties." (Sentencing Tr., Dkt. No. 141, at 29:22–30:6.) The Court found that, [w]ithout detracting from the seriousness of the crime," Dandach's "mental health condition does need to be taken into account in terms of imposing a sentence that is reasonable as Booker requires[.]" (Id.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

The Court sentenced Dandach to terms of imprisonment of 180 months on Count 1 and 120 months on Count 2, to be served concurrently. (Id. at 30:7–9.)

### C.     *Dandach Has Served Approximately Ten Years of His Sentence*

From the date of his motion, Dandach has since been incarcerated for approximately 10 years. (Mot. at 2.) Dandach contends that he has "evolved both in thought and action" and has "detach[ed] himself from radical Islamic [ideology]." (Id.) The former Psychiatry Chief Dr. Daniels has "openly stated that defendant Dandach has been 'criminologically rehabilitated,'" as have other psychologists. (Id.)

Dandach discusses the harsh reality of serving time in prison, including other prisoners who "instigate problems" and "do whatever they can to push people's buttons trying to get them to go off." (Id. at 3.) Specifically, Dandach claims that he is "housed with seriously mentally ill individuals who have committed violent rape, murder, arson and other violent offenses." (Reply at 2.) Dandach asserts that he is not violent, though he has acted out in his defense . . . ." (Id.) Dandach describes with detail that he is the "target of bullies who make fun of his religion and his race or national origin" as well as his seeking mental health treatment. (Id.) On at least one occasion, Dandach details his attempts to stop a prison fight between the Muslim community and the [Aryan] Brotherhood of Texas ("ABT")[1] after an altercation where an ABT member had pushed Dandach, prompting a potentially violent response from the Muslim community. (Id. at 3.) Dandach also discusses his attempts to step in and report a fellow inmate for selling K2, a dangerous drug often circulated in prison. (Id.)

Despite the harsh day-to-day described by Dandach, he asserts that he has "adjusted well to the prison environment" and learned to deal with instigators, to some degree, "seeking help from counselors and those around him when problems arrise [sic]." (Mot. at 3.) Dandach is seeking medical treatment from a top care facility in the nation and working to better himself. (Reply at 2–3.)

---

[1] The ABT is a far-right neo-nazi extremist group in that has a presence in many United States prisons and is known for, among other things, hostility towards Muslim-Americans in the aftermath of September 11, 2001. See *Aryan Brotherhood of Texas*, S. POVERTY L. CTR., https://www.splcenter.org/fighting-hate/extremist-files/group/aryan-brotherhood-texas (last visited November 20, 2024).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  8:14-cr-00109-JVS                           Date  January 7, 2025

Title  United States v. Dandach

Dandach acknowledges that while he "has done all he can to improve himself while being incarcerated, there is of course still more work to be done." (Id. at 4.) Occasionally, Dandach says he is pushed to the point that he "acts out in a way that is not socially acceptable," but that he "does not want to hurt other people or see other people do things that will cause harm to themselves or others[.]" (Reply at 3.) However, Dandach believes that he is ready to return to his community where he can participate in community based treatment programs and further his education, with the care and surrounding of his family and back in his home. (Mot. at 4.) Dandach has published poetry and song lyrics, taught himself how to read Arabic to help him understand "the true meaning of the Qu'ran" and attends weekly psychiatric programs and therapy sessions. (Id.)

## II. LEGAL STANDARD

A.  *Reduction in Sentence Under 18 U.S.C. § 3582(c)(2)*

Under 18 U.S.C. § 3582(c)(2), a court may reduce the term of imprisonment "of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o)." 18 U.S.C. § 3582(c)(2). Section 3582(c)(2) "does not authorize a resentencing. Instead, it permits a sentence reduction within the narrow bounds established by the Commission." Dillon v. United States, 560 U.S. 817, 831 (2010). District courts are instructed to follow a two-step approach to § 3582(c)(2) motions:

> A court must first determine that a reduction is consistent with § 1B1.10 before it may consider whether the authorized reduction is warranted, either in whole or in part, according to the factors set forth in § 3553(a).

Id. at 827.

B.  *Reduction in Sentence or Compassionate Release under 18 U.S.C. § 3582(c)(1)*

The First Step Act under 18 U.S.C. § 3582(c)(1)(A) "empowers either a defendant, or the Director of the Bureau of Prisons on behalf of a defendant, to file a motion to modify a term of imprisonment." United States v. Chen, 48 F.4th 1092, 1094 (9th Cir.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

2022).  Courts may reduce a defendant's term of imprisonment under § 3582(c)(1)(A) if four conditions are met:

(1) the defendant exhausted administrative remedies;

(2) "extraordinary and compelling reasons" warrant a sentence reduction;

(3) a sentence reduction is "consistent with applicable policy statements" issued by the U.S. Sentencing Commission; and

(4) the district court considered the factors set forth in 18 U.S.C. § 3553(a).

Id. at 1094–95.

### III.  DISCUSSION

    A.    *Relief Under § 3582(c)(2)*

Dandach first contends that "recent change[s] in sentencing guidelines, specifically Amendment 821" allow this Court to reduce sentences where a defendant has "already served and . . . is being housed in an environment that is volatile and not conducive to proper mental health treatment."  (Mot. at 3.)  The Court interprets this argument as a request for reduction in sentence under § 3582(c)(2).[2]

Dandach is correct that USSG §1B1.13 authorizes a retroactive change in sentencing guidelines to be considered for sentence reduction.  However, for the following reasons, Amendment 821 does not apply Dandach's case.

On August 31, 2023, the United States Sentencing Commission[3] promulgated new sentencing guidelines ("Amendment 821") which became effective on November 1,

---

[2] Dandach's arguments focus primarily on § 3582(c)(1) extraordinary and compelling, but his argument for a reduction in sentence pursuant to amended guidelines is properly governed under § 3582(c)(2).

[3] The United States Sentencing Commission is an independent agency in the judicial branch.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

2023.  See Sentencing Guidelines for the United States Courts, 88 Fed. Reg. 60,534 (Aug. 31, 2023).  Amendment 821 has three significant impacts, broken into parts.  Part A "limits the overall criminal history impact of 'status points'," which are those additional criminal history points given to criminal defendants for committing an offense while under a criminal justice sentence.  Id.  In implementing Part A, the Commission "determined that accounting for status on a more limited basis continues to serve the broader purposes of sentencing while also addressing other concerns" such as recidivism.  Id.  Part A applies retroactively for the purpose of sentence reduction, effective February 1, 2024.  Id.

      Part B created a new guidelines for adjusting certain Zero-Point Offenders.  Id.  Specifically, Part B provides a decrease of two levels from an offense level "determined under Chapters Two and Three."  Id.  However, such reduction is only applied to "defendants who did not receive any criminal history points under Chapter Four, Part A and whose instant offense did not involve specified aggravating factors."  Id.  Like Part A, Part B applies retroactively for the purpose of sentence reduction and became effective February 1, 2024.  Id.  Part C reassesses marijuana possession sentences.[4]  Id.

      Part A of Amendment 821 is unavailing for Dandach.  At the time of sentencing, the Court made no enhancement for status points.  Thus, there is no basis to reduce sentencing where the original sentence remains consistent with Amendment 821.  Likewise, a sentence reduction is not warranted under Part B.  The PSR, adopted by the Court, noted that the criminal history score was zero.  (PSR ¶ 54.)  However, while this would ordinarily result in a category I criminal history, the PSR recommended that "pursuant to USSG §3A1.4(b), a criminal history category should be VI."  (Id.)  USSG §3A1.4(b) increases a Chapter Four category to Category VI for all felony offenses that involved, or were intended to promote, a federal crime of terrorism.  Part B of Amendment 821 ("Adjustment for Certain Zero-Point Offenders") specifically carves out §3A1.4 (terrorism) from receiving an adjustment.  In other words, while many other defendants with no prior criminal history may benefit from Amendment 821, Dandach's terrorism offense is specifically excluded from such leniency.  Thus, there is no basis to reduce sentencing under Part B.

---

[4] Dandach's sentence is unrelated to marijuana possession and thus, Part C is not relevant to the remaining analysis.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

Accordingly, in this case, Amendment 821 does not warrant a reduction in sentencing because it is inapplicable to Dandach.

   B.   *Relief under § 3582(c)(1)*

      1.   Exhausted Administrative Remedies

Dandach has met the administrative exhaustion requirement by submitting a request to the correctional facilities and waiting at least 30 days to file the present motion.  See § 3582(c)(1)(A); (Opp'n at 4.)

      2.   Extraordinary and Compelling Reasons

Prior to 2018, the Bureau of Prisons ("BOP") "rarely granted compassionate release petitions." United States v. Rodriguez, 424 F. Supp. 3d 674, 682 (N.D. Cal. 2019).  When Congress enacted the First Step Act, it allowed defendants to file motions in district court directly after the BOP directors denied their petition.  Id.  In order to ensure that district courts would increase the use of compassionate release, courts were empowered to consider a vast variety of circumstances that could constitute "extraordinary and compelling." Id. (citing United States v. Brown, 411 F. Supp. 3d 446, 450–51 (S.D. Iowa 2019)).

In assessing this second element, the Ninth Circuit has held that "district courts are empowered . . . to consider any extraordinary and compelling reasons for release that a defendant might raise." United States v. Aruda, 993 F.3d 797, 801 (9th Cir. 2021) (internal quotations omitted).  Absent a policy statement from the Sentencing Commission, "the determination of what constitutes extraordinary and compelling reasons for sentence reduction lies squarely within the district court's discretion." Id. at 802.  Moreover, "district courts may consider non-retroactive changes in sentencing law, in combination with other factors particular to the individual defendant, when analyzing extraordinary and compelling reasons for purposes of §3582(c)(1)(A)." Chen, 48 F.4th at 1098.

Dandach proposes several reasons why sentence reduction is warranted, including medical conditions, similar terrorist sentencing reductions, and his rehabilitation.  The Court takes each in turn.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

### a. Medical Conditions

Dandach argues that a reduction in sentence is warranted on the basis that his mental health issues played a major role in his life and are not being improved in prison. (Mot. at 2.) The following is taken from Dandach's motion.

As a teen, Dandach had mental health issues that caused self-defeating behaviors. (Id.) Dandach had severe weight problems, was socially isolated, severely ill, and very impressionable as a gullible teenager. (Id.) Moreover, Dandach had to deal with self-abuse and destructive behaviors. (Id.) When he made the "unwise choice of attempting to travel to Syria in 2014," Dandach's home life was a culture clash of American life and Islamic roots. (Id.) In the post-9/11 era, Dandach felt prejudice expressed towards middle-easterners, which contributed to his decision to help a known terrorist organization. (Id.)

In prison, Dandach contends that inmates instigate problems and "do whatever they can to push people's buttons trying to get them to go off." (Id. at 3.) Ultimately, Dandach states that prison is not a conducive place for him to deal with his mental health treatment. (Id.)

"Medical conditions" is a well-recognized scenario where compassionate release may be available, particularly following the COVID-19 pandemic. Aruda, 993 F.3d at 801; United States v. Sawyers, 2021 WL 2581412, at *3–4 (C.D. Cal. June 22, 2021). However, the medical conditions reason comes from USSG §1B1.13, cmt. n.1(A)–(D), which outlines examples of the types of medical conditions that may warrant relief. The following are examples taken from §1B1.13: (A) a terminal illness, (B) a serious cognitive impairment that is deteriorating because of age, (C) a serious medical condition that requires long-term or specialized medical care that is not being provided for and without which the defendant is at risk of serious deterioration in health or death, or (D) an outbreak of an infectious disease. Id. Generally, adequate medical treatment provided by BOP weighs against granting compassionate release. See United States v. Sineneng-Smith, 2022 WL 1304106, at *4 (N.D. Cal. May 2, 2022) (collecting cases).

Here, Dandach's claim fits most neatly in the third scenario, wherein a serious medical condition requiring long-term care may warrant compassionate release. The government fails to provide a robust response to Dandach's claim and the Court agrees

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

with Dandach that his schizoaffective disorder, PTSD, and autism spectrum disorder may, in fact, qualify as serious enough in nature to warrant a sentence reduction under the Court's discretion.

However, crucially, Dandach is unable to show that treatment is not being provided for currently. To the contrary, Dandach has stated that he "has adjusted well to the prison environment" and "has learned to deal with people and instigators to some degree . . . ." (Id.) Moreover, Dandach states that he is "seeking help from counselors and those around him when problems arrise [sic]" and has "learned to talk to people about his problems." (Id.) Further, Dandach has demonstrated great resilience in overcoming his schizoaffective disorder, PTSD, and autism spectrum disorder, all while navigating prison life, with the help of the nationally acclaimed Mayo Clinic. (Reply at 1.) Such remarkable improvement, however, weighs against a showing of extraordinary and compelling *medical* reasons for compassionate release.

### b. "Other" Reasons

The vast majority of district courts have concluded that, in the absence of policy statements, courts can determine other extraordinary and compelling reasons for compassionate release. See Rodriguez, 424 F. Supp. 3d at 682; see also Aruda, 993 F.3d at 801. Dandach presents two other reasons for the court to consider. First, Dandach notes the mental anguish of being away from his family in California and that they have suffered from his absence. Second, Dandach cites several cases where courts have granted compassionate release for terrorist-related offenses. For the following reasons, the Court finds that neither reason is extraordinary and compelling.

### i. Family Support

Dandach cites United States v. Ziegler. In Ziegler, the defendant requested compassionate release to care for his terminally ill mother as the only available caregiver. Ziegler, 2023 WL 5769448, at *2 (D. Minn. Sept. 7, 2023). The court, citing an abundance of case law on the subject, found that extraordinary and compelling grounds for compassionate release exist where a parent is incapacitated and the defendant is the only possible caregiver. Id. at *4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

The caregiver/family support rationale is common in compassionate release requests.  See, e.g., United States v. Moalin, 2021 WL 3419417, at *7 (S.D. Cal. 2021) (discussing the limited nature of the caregiver exception).  Dandach's reliance on Ziegler, however, is misplaced in light of the narrow holdings of these cases.  Dandach has not argued that either parent is incapacitated, nor has he demonstrated that he is the only care giver.  See United States v. Ingram, No. 2:24-CR-40, 2019 WL 3162305, at *2 (S.D. Ohio, July 16, 2019) (finding that a mother's deteriorating condition "was not extraordinary because 'many, if not all inmates, have aging sick parents''); see also United States v. Bragg, 2021 WL 662269, at *2 (S.D. Cal. Feb. 19, 2021) (finding that a defendant must make a robust showing that they are the only available caregiver).  Accordingly, relief cannot be granted on this basis.

### ii.    Change in Terrorism-Related Offenses

Dandach next cites Hammoud, where the court granted compassionate release finding that there was a (1) sheer and unusual length of sentence and (2) gross disparity between the original sentence and those now deemed appropriate.  United States v. Hammoud, 2022 WL 17320671, at *3 (W.D.N.C. Nov. 29, 2022) (citing United States v. McCoy, 981 F.3d 271 (4th Cir. 2020)).

In Hammoud, the defendant was sentenced to 360 months under §2339B.  Id.  The defendant, Hammoud, was the first individual ever to be convicted at trial of violating §2339B and the first terrorism trial to be held after September 11, 2001.  Id.  The effect of terrorism enhancements on Hammoud's case jumped his offense level from 34 to 46 and his criminal category from the lowest (I) to the highest (VI)—although the court ultimately varied from the sentencing guidelines.  Id. at *4.  On a motion for compassionate release, the court noted that instead of 151–81 months, the guidelines—with terrorism enhancements—called for a life sentence.  Id.  Further, while Hammoud's crime was nonviolent, his sentence of 360 months was significantly more punitive than the federal sentence for murder: 215 months for a category I, and 249 months for defendants in category VI.  Id. at *3.  Finally, since Hammoud's sentencing, the median sentence for individuals convicted at trial under the statute had become 180 months.  Id. at *3.  Therefore, given that "[t]he specter of terrorism enhancement . . . loomed over Hammoud's sentencing," the court found that extraordinary and compelling reasons had been satisfied.  Id. at *4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   8:14-cr-00109-JVS                                        Date   January 7, 2025

Title   United States v. Dandach

    Dandach's reliance on Hammoud is squarely on point and thus, the Court will consider the factors that the Hammoud court considered: (1) sheer and unusual length of sentence and (2) gross disparity between the original sentence and those now deemed appropriate. See id. at *3.

    The usual length of sentence for an offense with a terrorism adjustment under USSG § 3A1.4 generally "translates to a sentencing range of 210 to 262 months in prison."[5] In 2014, an individual with an offense level of 37 and a criminal history category VI faced a Guidelines range of 360 months to life imprisonment. Sentences that fall too far below or above the Guidelines have been vacated and remanded. See, e.g., United States v. Ceasar, 10 F.4th 66, 70 (2d Cir. 2021) (vacating a 48-month sentence for conspiracy to violate § 2339B for being "shockingly low" compared to other sentences for similar crimes); see also United States v. Kaziu, 559 F. App'x 32 (2d Cir. 2014) (finding that a 27 year sentence was not excessive for attempting to provide material support to a foreign terrorist organization). The Ninth Circuit has affirmed sentences under § 2339B with a terrorism enhancement as large as 360 months. See United States v. Elhuzayel, 807 F. App'x 621 (9th Cir. 2020).

    It is common for district courts to impose the statutory maximum of 180 months (15 years) for a § 2339B violation, and was certainly common in 2014. See, e.g., United States v. Chandia, 674 F.3d 329 (4th Cir. 2012) (upholding a 180 month sentence for conspiracy to provide material support to terrorists and a foreign terrorist organization despite a Guideline range of 360 months to life).[6]

---

[5] See Congressional Research Center, *Terrorist Material Support: An Overview of 18 U.S.C. §2339A and §2339B*, August 15, 2023, at 25 https://crsreports.congress.gov/product/pdf/R/R41333 (last visited Oct. 21, 2024).

[6] See also United States v. Badawi, 2021 WL 4735022, at *1 (C.D. Cal. June 28, 2021) (sentencing defendant to 180 months imprisonment for conspiracy to provide material support to a foreign terrorist organization and 180 months imprisonment for aiding and abetting the same); United States v. Jameson, 2021 WL 1405598, at *1 (E.D. Cal. Apr. 14, 2021) (same); United States v. Tounisi, 900 F.3d 982 (7th Cir. 2018) (upholding 180 month imprisonment and lifetime supervised release for attempting to provide material support to a foreign terrorist organization where terrorism enhancement was applied); United States v. Mora-Pestana, 496 F. App'x 98 (2d Cir. 2012) (same); United States v. Young, 818 F. App'x 185 (4th Cir. 2020) (same); United States v. Saidakhmetov, 2018 WL 461516 (E.D.N.Y. 2018) (same); United States v. Juraboev, 2017 WL 5125523 (E.D.N.Y. 2017) (same).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

Here, Dandach's sentence under §2339B was for 180 months, which was set to run concurrently with Count Two, making false statement on a passport application. (Statement of Reasons, Dkt. No. 140, at 11.) This sentence was common for § 2339B violations and thus, is not sheer and unusual. Additionally, unlike in Hammoud, Dandach's 180 month sentence for a non-violent offense is lower than the Guidelines range for many violent offenses.

Next, the Court considers whether there is a gross disparity between the original sentence and those now deemed appropriate. In 2020, the average sentence for offenders convicted of material support to terrorism was 209 months. Hammoud, 2022 WL 17320671, at *3. In 2023, the average had sharply declined to 141 months.[7] While these numbers are inconsistent, the average between these two years amounts to 175 months. This is in alignment with Dandach's sentence of 180 months. Dandach's sentence also roughly aligns with the current average sentence for offenders who received a terrorism enhancement under USSG §3A1.4. In 2020, the average sentence for offenders who received a terrorism adjustment under USSG §3A1.4 was 179 months. See Hammoud, 2022 WL 17320671, at *3. In 2023, this average has declined to 172 months.[8]

Dandach provides an index of recent cases where individuals were sentenced to far less than 180 months. (See Appendix A, Dkt. No. 162.) However, the cases relied on by Dandach are generally misplaced. For instance, several of the cases purporting to represent "material support cases" simply aren't so. See, e.g., United States v. Fong, Case No. SACR 20-00146-DOC-1 (ADSx) (46 month sentence where material support charges were terminated); United States v. Samana, Case No. SACR 05-00214-CJC-4 (70 month sentence that specifically did not carry a terrorism enhancement). On this Court's review, the lower end of sentencing for material support cases under § 2339B is generally around 140 months. See Ahmad v. Jacquez, 860 F. App'x 459 (9th Cir. 2021) (defendant sentenced to 144 months imprisonment for providing material support and resources to a foreign terrorist organization in violation of § 2339B). This is not the average, but merely an observation of the lower-end of § 2339B sentences.

---

[7] See United States Sentencing Commission, *Quick Facts: National Defense Offenders*, https://www.ussc.gov/research/quick-facts/national-defense (last visited Oct. 21, 2024).

[8] See United States Sentencing Commission, *Quick Facts: National Defense Offenders*, https://www.ussc.gov/research/quick-facts/national-defense (last visited Oct. 21, 2024).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:14-cr-00109-JVS | Date | January 7, 2025 |
| Title | United States v. Dandach | | |

Dandach's sentence is generally within the range of recent sentences for offenders convicted of material support to terrorism. Thus, on both of the Hammoud factors, the Court declines to reduce Dandach's sentence.

### c. Rehabilitation

"Rehabilitation . . . alone" is not an extraordinary and compelling reason. Chen, 48 F.4th at 1096. In this case, there are no other extraordinary and compelling reasons to reduce sentencing.

### 3. 18 U.S.C. § 3553(a) Factors

Courts are instructed to consider whether the factors set forth in § 3553(a) warrant compassionate release or a reduction in sentence. 18 U.S.C. § 3553(a) sets forth seven factors that courts consider when imposing sentence, including the nature and circumstance of the offense, the need to impose sentence, the sentence ranges, policy statements, the need to avoid sentence disparities, and any restitution available. 18 U.S.C. § 3553(a).

Because the Court has found that sentence reduction or compassionate release are not warranted, the Court need not analyze whether § 3553(a) factors warrant relief.

### IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** the motion.

A copy of this minute order is sent via US Mail to: Adam Dandach, Reg. No. #67945-112, Federal Medical Center, PMB 4000, Rochester, MN 55903-4000.

**IT IS SO ORDERED.**